## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

MAJ SHANNON L. MCLAUGHLIN, et al.          )
                                                )

     Plaintiffs,                                    )
                                                )

     v.                                              )   No. 1:11-cv-11905-RGS
                                                )

CHUCK HAGEL, in his official capacity as        )
Secretary of Defense; et al.,                   )   Leave to File Granted
                                                )   on December 16, 2013

     Defendants.                                    )
_____     )

## REPLY BRIEF IN SUPPORT OF PLAINTIFFS' APPLICATION
## FOR AN AWARD OF ATTORNEYS' FEES AND COSTS

### Introduction

The Plaintiffs brought this action to challenge the constitutionality, not only of the Defense of Marriage Act ("DOMA"), but also of four other statutes that prevented the recognition of same-sex spouses of service members and veterans. They prevailed as to every one. The benefits they got through the judgment they obtained in this case go well beyond what they would have received as a result of the <u>Windsor</u> decision. Plaintiffs plainly prevailed and the judgment they obtained materially alters their relationship with Defendants.

The Defendants' opposition to these legal claims was not "substantially justified." The government does not deny that the Executive Branch Defendants knowingly and intentionally violated the Plaintiffs' constitutional rights, which necessitated this lawsuit and those same Defendants made no efforts to defend their unconstitutional actions before this Court. The government also concedes – as it must – that nothing compelled the Executive Branch Defendants to enforce the unconstitutional laws at issue in this case against the Plaintiffs, to their detriment, after the same Executive Branch Defendants concluded those laws were unconstitutional. Under these circumstances, the government cannot credibly maintain the

Executive Branch Defendants were "substantially justified" in forcing the Plaintiffs to litigate a case that the government itself would not even defend.

In addition to denying its obligation to pay Plaintiffs' attorneys' fees under the Equal Access to Justice Act ("EAJA") at all, the government has filed its standard, boiler-plate objections to the amount of fees requested.  But the government has failed to demonstrate that any of the fees sought are unreasonable, and Plaintiffs already have discounted their fees by 5% to mitigate any concern over the fee amount.  The fact is this was in important, precedent-setting case and the work involved in obtaining this important victory was both limited and justified.  The EAJA exists to encourage persons, like the Plaintiffs, whose constitutional rights were unreasonably violated to go to court to vindicate their rights.  That is precisely what the Plaintiffs did, they succeeded and it would be undermine the EAJA not to pay their attorneys' fees.[1]

**ARGUMENT**

**I.     ATTORNEYS' FEES ARE WARRANTED UNDER THE EAJA**

**A.     The Government's Litigating Position Was Not Justified**

The government offers no credible explanation as to how forcing the Plaintiffs to litigate a case the government itself would not defend was a "substantially justified" litigating position.  Instead, the government defends a litigating position the United States did <u>not</u> take.

The government did not defend the constitutionality of DOMA in <u>United States v. Windsor</u>, 133 S. Ct. 2675 (2013), and it did not defend DOMA or the language challenged in Titles 10, 32 and 38 in <u>McLaughlin</u>.  In both cases, the government agreed with the Plaintiffs that

---

[1] Pursuant to Rule 54(d), in addition to the EAJA, Plaintiffs have sought as costs the $350 filing fee for the Complaint.  There is no objection by the government to paying these costs.

the laws in question were unconstitutional.  Despite concluding those laws were unconstitutional, the Executive Branch Defendants nevertheless chose to violate the Plaintiffs' constitutional rights so they could trigger a lawsuit, and they hoped the courts would agree with the government's view those laws were unconstitutional.  In other words, the government violated the Plaintiffs' rights to trigger a lawsuit that the government wanted to lose.  It is hard to understand how a legal defense designed to trigger a loss could ever be "substantially justified" or how the government could now complain about the existence of this case when the government knew its enforcement of an unconstitutional law was bound to trigger numerous cases like it.

The government now notes that Windsor was a 5-4 decision and claims that is proof the case "presented a significant constitutional issue," and argues that even a position that happened to lose could still be substantially justified.  (Dkt. 59 at 9.)  But whether or not a "substantially justified" defense of DOMA or the challenged language in Titles 10, 32 and 38 could have been made is not relevant, as that was not the government's litigating position.  Had the government believed in good faith those laws were constitutional, defended those statutes in court and lost, there would be a very different issue as to whether the government's defense of the laws was "substantially justified."   The government offers no authority for the proposition that the government is "substantially justified" in taking an action it believes will violate persons' constitutional rights and actions that it will not defend in court.

The government also mistakenly conflates the Supreme Court's discussion of justiciability in Windsor with whether the government's position was "substantially justified" under the EAJA (the latter question was never before the Court in Windsor).  The justiciability problem the Court addressed in Windsor was that the plaintiff and the government sought the same relief – a holding that DOMA was unconstitutional – so the question was whether there

was a genuine dispute.  <u>Windsor</u>, 133 S. Ct. at 2685.  Ultimately, because the Second Circuit's decision invalidating DOMA required the government to return taxes to the plaintiff the government would not have otherwise returned (even though the government agreed it should), the Supreme Court held there was a real injury and a genuine case before it.  <u>Id.</u> at 2686.

In the context of addressing whether there was an actual injury for standing purposes and rules of prudential standing, the Supreme Court explained the government's approach of enforcing laws it would not defend as constitutional in court created a "procedural dilemma."  <u>Id.</u> at 2688.  The Court "underscored" that the arguments form dismissing the case on prudential grounds do not "lack substance," and made clear it would be troubled if this became a "common practice in ordinary cases."  <u>Id.</u> at 2688.  The Court added that the "integrity of the political process would be at risk if difficult constitutional issues were simply referred to the Court as a routine exercise."  <u>Id.</u> at 2689.  But because "this case is not routine," the Court proceeded to consider the merits.  <u>Id.</u>

The fact that the <u>Windsor</u> Court found that the government's approach presented a genuine dispute for Article III purposes says nothing as to whether the government is "substantially justified" in forcing plaintiffs to litigate cases against the government that the government does not even try to win.  The most the Court says to help the government is to acknowledge that a President who determines a law is unconstitutional "faces a difficult choice," but the Court did not attempt to make that choice any easier for the President by eliminating the consequences of any of those choices.  <u>Id.</u> at 2689.  And rather than legitimize the choice the President followed here, the Court frowned upon it and made clear it would not be permitted to become the norm.

4

Moreover, choices have consequences.  For political reasons, it may be understandable for a President to seek and obtain the blessing of the courts for his actions, as he did here.  But another consequence of intentionally violating the rights of U.S. citizens and not seeking to defend those actions in court is that the government's litigating position should be found not "substantially justified," and the Plaintiffs who are forced to turn to the courts for assistance (because the Executive Branch refuses to adhere to the Constitution) should have their legal fees paid under the EAJA.  That is the price the Executive Branch must pay if it chooses to manufacture litigation it will not defend.  The government cannot be "substantially justified" in violating the constitutional rights of its citizens so that it can force a lawsuit where it hopes the courts will confirm that they in fact did violate the rights of its citizens.

The government's opposition has a peculiar discussion about the issue needing to be addressed by the Supreme Court because it was not settled whether  sexual orientation warrants heightened scrutiny.  (Dkt. 59 at 8.)  Regardless of how interesting a legal question that may be, the government is not "substantially justified" in intentionally violating the Plaintiffs' constitutional rights and then asking the Court to agree it violated their constitutional rights.  Moreover, this legal issue was not central to the Windsor litigation.  Indeed, the government argued to the Supreme Court that DOMA was unconstitutional under rational basis and the Supreme Court agreed, so there was no need for the Court to ever address whether a higher standard of review was necessary.  Windsor, 133 S. Ct. at 2693.

Likewise, the government's argument that the "magnitude" of DOMA's scope was so great that it warranted getting a second opinion from the Supreme Court is perverse.  (Dkt. 59 at 8-9.)  Conversely, the government's "magnitude" argument is that its decision to enforce a law that it believed was unconstitutional meant that it violated the constitutional rights of a great

many number of people.  Why did the government take an action it believed was unconstitutional and would violate the constitutional rights of so many people?  The government's answer is that it wanted the Supreme Court to confirm that its actions violated the constitutional rights of so many people.  That is no answer at all.

The government's position also fails because the government concedes its approach was not constitutionally required.  Although the government argues the President litigated the case to fulfill his obligation to take care that the laws are faithfully executed (Dkt. 59 at 5 (citing U.S. Const. Art II, § 3), the government does not address the fact that the primary law the President must execute is the Constitution – even if it conflicts with a statute like DOMA.  (Dkt. 56 at 12-14.)  Indeed, the government concedes "the President may decide in certain circumstances not to enforce a statute he determined to be unconstitutional."  (Dkt. 59 at 6.)  Numerous Presidents, including President Obama, have refused to enforce laws they believed were unconstitutional.  (Dkt. 59 at 14.)  As Plaintiffs noted in their initial fee application, the Executive Branch has told Congress the opposite – that a President who enforced a statute that was unconstitutional would violate his constitutional duty:

> A President that places the statutory law over the constitutional law . . . would fail in his duty faithfully to execute the laws.  <u>The principle is equally sound where the Supreme Court has yet to rule on an issue, but the President has determined that a statutory law violates the Constitution.</u>  To say that the principle is not equally sound in this context is to deny the President's independent responsibility to interpret and uphold the Constitution.  It is to leave the defense of the Constitution only to two, not three, of the branches of our government.

<u>Oversight Hearing: Presidential Signing Statements under the Bush Administration: A Threat to Checks and Balances and the Rule of Law? Before the H. Comm. on the Judiciary</u>, 110th Cong. 5 (2007) (statement of John P. Elwood, Deputy Assistant Attorney General of the United States) (emphasis added).  Moreover, courts had ruled DOMA unconstitutional prior to <u>McLaughlin</u>

being filed and after, but the government still continued litigating this case.  (Dkt. 56-1 at 12 (listing cases).)

While the Executive Branch typically will enforce and defend a statute it believes may be unconstitutional if reasonable arguments in favor of constitutionality could be made, in the DOMA context the Executive Branch determined no "reasonable arguments" could be made in its defense.  (Dkt. 29-1 at 5.)  Given that the Executive Branch found this a sufficient reason not to defend DOMA, it should be an equally sufficient reason not to enforce DOMA.  Indeed, the Executive Branch itself vigorously argued in this case that the judicial defense of a statute is part of its responsibility under the Take Care Clause.  (Dkt. 37.)  The government's approach also would raise equal protection issues in its own right for the President to enforce unconstitutional laws that hurt one class of persons as DOMA did, while at the same time refusing to enforce unconstitutional laws that harm different groups.

### B.   No Special Circumstances Warrant Denial Of Attorneys' Fees

The government claims special circumstances warrant denying attorneys' fees in this case because it claims the government was going to confer the same benefits on the Plaintiffs anyway – regardless of any judgment by this Court.  But the government made the same argument to the Court in asking the Court not to enter a judgment at all in this case (Dkt. 50), and the Court rejected that argument and held a judgment was warranted (Dkt. 52).  That argument should be rejected here as well.

The government notes the President had directed the Attorney General to stop defending DOMA in court even prior to the McLaughlin suit being filed, and claimed it provided the relief requested by the Plaintiffs in response to Windsor.  (Dkt. 59 at 11.)  But the government has its history wrong.  The McLaughlin suit was filed on October 27, 2011 (Dkt. 1), and the government

did not initially treat this case as governed by the policy it had taken in <u>Windsor</u>. If the government merely had to repeat the stock position it had taken previously, it would have been no trouble for the government to file its answer. Nevertheless, the government sought an extension of time, explaining to the Court that it needed more time to coordinate its litigation position between three separate federal agencies and to consider both the DOMA challenge and the new challenges to Titles 10, 32 and 38 (Dkt. 26).

The reason the government needed additional time was that it needed to determine whether anything unique in the military context would alter its view of DOMA more generally, and to address the new challenges to Titles 10, 32 and 38 – challenges that no other litigant had made previously. Because of the unique statutory challenges in this case, and the unique application of DOMA in the military context, it was by no means clear that the government's prior decision with respect to DOMA would benefit the military Plaintiffs in <u>McLaughlin</u>.

The Attorney General later explained in February 2012 that the <u>McLaughlin</u> litigation was different from the prior DOMA litigation and noted his agreement with the Plaintiffs' legal position with respect to these new challenges in letters to the Court (Dkt. 28-1) and to the Speaker of the House (Dkt. 28-2). This was the first time the government had taken a definitive position on a challenge to Titles 10, 32 or 38, or addressed DOMA in the military context, and it was due to <u>McLaughlin</u> being filed.

The government's argument that the Plaintiffs would receive all the benefits they obtained following <u>Windsor</u> without this suit also is untrue. <u>Windsor</u> was decided on June 26, 2013, and nearly two months later, on August 14, 2013, the Secretary of Veterans Affairs advised Congress that the decision did not resolve constitutional questions over Title 38. (Dkt. 51-1.) In doing so, the Secretary specifically noted that the constitutionality of Title 38 was still

being litigated in <u>McLaughlin</u>.  (<u>Id.</u> at 2.)  The Attorney General did not advise Congress that it would no longer enforce Title 38 until September 4, 2013 – more than two months after <u>Windsor</u> was decided.  (Dkt. 50-1.)

Nor can the government claim the Plaintiffs should not get credit for this Court's judgment holding Title 38 unconstitutional because another court held Title 38 unconstitutional in <u>Cooper-Harris v. United States</u>, No. 2:12-00887-CBM (C.D. Cal. Aug. 29, 2013).  (Dkt 59 at 11.)  <u>McLaughlin</u> was filed before <u>Cooper-Harris</u>, and the <u>McLaughlin</u> counsel assisted the <u>Cooper-Harris</u> counsel in preparing their case (no fees for that work are being sought in this application).  It is true the <u>Cooper-Harris</u> court ruled before this Court did, but that court has not entered a judgment.  Consequently, the only binding court order against the Defendants is the one that exists in this case.  Moreover, <u>Cooper-Harris</u> did not address the Title 10 or 32 challenges.  The only court order addressing those challenges is the one that exists in this case.

In addition, the Court's judgment in this case is broader than any remedy the government has otherwise provided.  As the government advised the Court, the Department of Defense has made benefits under Titles 10 and 32 retroactive to the date of the <u>Windsor</u> decision, June 26, 2013.  (Dkt. 50-1.)  The Secretary of Veterans Affairs, however, still has not addressed how retroactivity questions will be addressed under Title 38.  In any event, this Court's judgment extends the Plaintiffs' benefits under Titles 10, 32 and 38 back to the date they attempted to register for benefits – dates ranging from September to October 2011 – more than a year-and-a-half more benefits.  (Dkt. 55; <u>see also</u> <u>Western Watersheds Project v. Secrist</u>, 2006 WL 897718, at *2 (D. Idaho March 31, 2006) (refusing to reduce EAJA award based on government claim it

would have provided Plaintiffs the relief sought anyway); <u>Seven Named Tricare Beneficiaries v.</u> <u>United States</u>, 2000 WL 33682698, at *2-3 (E.D.N.C. Jan. 26, 2000) (same).) [2]

Apart from being factually flawed, the government's argument that only the first litigant to prevail should receive fees has no place in the case law.  The purpose of the EAJA is to encourage people to sue when the government has unreasonably violated their civil rights. <u>Castaneda-Castillo v. Holder</u>, 723 F.3d 48 (1st Cir. 2013) ("The EAJA aims to 'ensure that certain individuals . . . will not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved.") (quoting <u>Aronov v.</u> <u>Napolitano</u>, 562 F.3d 84, 88 (1st Cir. 2009)).  When the government has violated the constitutional rights of many people, as it did here, it is reasonable to expect that there will be many litigants.  Prospective litigants and their prospective counsel should not be persuaded to sit on the sidelines with the hope other litigants will vindicate their rights for them.  And prospective litigants and their counsel should not have to fear that other cases may be decided ahead of theirs, even if filed later (as was the case with <u>Cooper-Harris</u>), or that they may miss out

---

[2]      The existence of this judgment may prove particularly important, as the Plaintiffs may need to call on this Court to enforce its judgment as it still has not been fully complied with by the government.  For example, the Veterans Administrations' website continues to advise veterans and their families, when they click a link to "Learn More" under "DOMA and Your Benefits":  "On June 26, 2013, the US Supreme Court held in the United States v. Windsor decision that section 3 of the Defense of Marriage Act (DOMA) is unconstitutional. VA is working closely with the Department of Justice (DOJ) to review relevant statutes and policies to implement any necessary changes to Federal benefits and obligations swiftly and smoothly in order to deliver the best services to all our nation's Veterans. Until VA and the DOJ determine the proper course of action, VA must continue to apply the current statutory guidance in Title 38 of the United States Code, which does not allow for payment of benefits based on same sex marriage."  <u>https://www.ebenefits.va.gov/ebenefits-portal/ebenefits.portal</u>.  Plaintiffs also have not yet received all past benefits owed to them.

on fees if the Supreme Court takes up a challenge brought in a different case over their challenge.  The uncertainty inherent in litigation would cause such a result to chill the exercise of the very rights the EAJA seeks to promote.

## II.     PLAINTIFFS REQUESTED FEES ARE REASONABLE

The government has filed boilerplate objections to Plaintiffs' attorneys' fee request, but those objections have no place here.  Given the magnitude of this Court's ruling, which benefits active duty members and veterans of every branch of the military, their families, and even the military itself, the cost of this litigation have been extraordinarily small.  Moreover, counsel had no reason to inflate their time working on this case, as there was no assurance they would necessarily succeed and be paid at all, and the capped rate is less than one-third of their standard billing rates.  Moreover, in seeking fees for their work at unprofitable rates (given the fee structure of a large firm), Plaintiffs' counsel still eliminated much from the bill voluntarily and reduced the remaining amount charged by 5% to avoid the sort of mini-trial the government now seeks on each time entry of the bill.

The government's effort to nitpick the bill ignores the Supreme Court's directive that "[a] request for attorney's fees should not result in a second major litigation."  Hensley v. Eckerhart, 461 U.S. 1933, 437 (1983); see Freeman v. Mukasey, 2008 WL 1960838, at *2 (9th Cir. Feb. 26, 2008) ("Because an attorneys' fees request should not result in a second major litigation, some informality of proof is appropriate.").  Accordingly, Plaintiffs will address the government's complaints as a general matter by category, rather than address each contested item individually.  Plaintiffs believe their 5% voluntary across-the-board cut adequately addresses any concern the government has raised.

A.    **The Plaintiffs' Success Warrants A Fee Award**

The government does not deny that the Plaintiffs obtained every bit of the relief they sought from the Court in their Complaint, but nevertheless claims the Plaintiffs award should be discounted by a lack of success.  (Dkt. 59 at 13-14.)  Here, the government just repeats its prior argument that the Executive Branch is giving the Plaintiffs what they have requested "because of the Supreme Court's ruling in Windsor" and "not because of Plaintiffs' litigation efforts."  (Id. at 13.)  Those arguments are refuted above.  (See, supra, Section I.B.)  Moreover, they already have been rejected by the Court.  The government argued to the Court not to impose a judgment against it because it would voluntarily give the Plaintiffs what they want, and this Court agreed that an enforceable judgment in the Plaintiffs favor was warranted.  (Dkt. 52.)  In addition the Judgment this Court imposed grants the Plaintiffs broader relief than the government is voluntarily providing other service members and veterans.  (See, supra, at 9.)[3]

The magnitude of Plaintiffs victory also should not be understated.   This Court's judgment provides important benefits to thousands of current and former members of the military and their families.   The Plaintiffs have argued at length that eliminating this discrimination helps the military in terms of recruitment and retention, strengthens the military

---

[3]    The government curiously contends "this Court did not rule on the only dispositive motion Plaintiffs filed" (Dkt. 59 at 14), but that renders the Court's judgment in Plaintiffs' favor inexplicable.  Plaintiffs filed a motion for summary judgment based on equal protection grounds (Dkt. 14), and this Court issued stays before the First Circuit decided a pending equal protection challenge to DOMA and then until after the Supreme Court decided Windsor because those cases could inform the Court's judgment about Plaintiffs' motion.  The Court's judgment was based on equal protection.  (Dkt. 55.)  The Court did not take it upon itself to question the constitutionality of DOMA and Titles 10, 32 and 38 on its own accord; the Court ruled on these issues because they had been raised by the Plaintiffs' motion.

family, builds unit cohesion and protects our national security – and the military has agreed. (Dkt. 14 at 5-11.)

A.      **The Case Was Not Overstaffed**

This case was leanly staffed.  There were only two lawyers from Outserve-SLDN involved and only two lawyers from Chadbourne & Parke billed more than 20 hours to the merits of the case in any single year.[4]  For a case of this magnitude, that is not a large team at all.

This case was complex and not just because of the constitutional issues at the center of the case.  This case involved dozens of benefits and support programs with different eligibility criteria that were administered by different federal agencies under three different titles of the U.S. Code and various regulations.  Assessments concerning benefits had to be made for each of the 16 Plaintiffs, and each of those clients had to be consulted throughout the litigation, often on issues unique to them individually (particularly when one Plaintiff died during the litigation). Considerable research also had to be done on the legislative history of the three titles, and of the case the military had made to Congress in seeking these benefits.  The lawyers from Outserve-SLDN had become experts on these programs and other aspects of military law.   Working together with the Chadbourne attorneys, who took the lead in litigating the case, the two teams worked together to formulate a coherent strategy and ensure the Court was presented with accurate facts and all applicable legal arguments.

Approaching the case from their different perspectives, the attorneys did review and edit drafts of various filings, but that duplication of effort improved the final product and no

---

[4]      Another Chadbourne associate billed more than 20 hours this year to the case, but she worked solely on the fee application.

deductions are warranted.  As the Ninth Circuit has noted, "[e]ven duplicative work . . . is not a justification for cutting a fee, unless the lawyer does <u>unnecessarily</u> duplicative work.'" <u>Mendez v. County of San Bernadino</u>, 540 F.3d 1109, 1129 (9th Cir. 2008) (emphasis in original) (quoting <u>Moreno v. City of Sacramento</u>, 534 F.3d 1106, 1113 (9th Cir. 2008)).  The First Circuit has "added that '[t]ime spent by two attorneys on the same general task is not . . . per se duplicative' since '[c]areful preparation often requires collaboration and rehearsal, especially in response to complex legal issues that are fiercely defended." <u>Castaneda-Castillo</u>, 723 F.3d at 80 (quoting <u>Rodriguez-Hernandez v. Miranda-Velez</u>, 132 F.3d 848, 860 (1st Cir. 1998)); <u>see also</u> <u>id.</u> at 80 ("[P]arties sometimes are justified in making a strategic choice to use teams of lawyers in various phases of complex litigation.") (quoting <u>Hutchinson ex rel. Julien v. Patrick</u>, 636 F.3d 1, 14 (1st Cir. 2011)).  Duplication often is required in litigation, and "[f]indings of duplicative work should not become a shortcut for reducing an award without identifying just why the requested fee was excessive and by how much." <u>Costa v. Comm'r of Soc. Sec. Admin.</u>, 690 F.3d 1132, 1136 (9th Cir. 2012).  Here, the involvement of a limited core of attorneys in drafting and editing documents, led to stronger arguments evolving, mistakes being avoided and better pleadings being submitted to the Court.[5]

---

[5]     The government also argued that Defendants raised three other constitutional challenges, and argues that work on unsuccessful claims should be discounted.  (Dkt. 59 at 14.)  But these were not exactly unsuccessful claims – they were not rejected by this Court.  Rather, the parties agreed the Court could rule in Plaintiffs' favor based on equal protection, so there was no need for the other issues to be addressed by the Court or even be briefed by the government.  In any event, the Supreme Court has made clear that fees are awarded for prevailing in the litigation as a whole, even for arguments that were not successful.  <u>INS v. Jean</u>, 496 U.S. 154, 161-162 (1990) (once a prevailing party qualifies for an EAJA award, the "fee award presumptively encompasses all aspects of the civil action," even where "the parties' postures on individual matters may be more or less justified").

B.      **Plaintiffs Did Not Bill For Media-Generating Activities**

This case received a great deal of media attention, but Plaintiffs counsel have not billed for any time spent generating that media attention.  Many of the Plaintiffs made statements to the press, and counsel understandably had to monitor those statement because they could constitute evidence at trial.  It was important for counsel to know what their clients were saying, particularly to ensure that nothing said could undermine their case.  In numerous instances, the statements made by the Plaintiffs in the press were submitted to the Court in subsequent pleadings.

Much of the press also focused on factual developments that were emerging as our litigation progressed.  The Department of Justice's position on the DOMA litigation evolved over time, Congress contemplated various legislative solutions to the problem, the military worked to confer many benefits despite DOMA and, after Windsor, the military explored whether Titles 10, 32 and 38 were unconstitutional, how to go about extending benefits and whether to make them retroactive.  It was important for counsel to stay abreast of these developments, particularly as the parties were providing status updates to the Court concerning these developments.  For example, it was through the press that Plaintiffs' counsel learned the Secretary of Veterans Affairs was advising Congress that Title 38's constitutionality had not been settled in Windsor and would continue to be enforced.  A fact conveyed to the Court in a status report.  (Dkt. 51-1.)

In addition, there was considerable attention given to McLaughlin and related cases in the legal press and by legal scholars.  It would have been irresponsible for Plaintiffs counsel not to review the published view of other legal scholars, as that is essentially free legal advice that could benefit them or could identify arguments for opponents that Plaintiffs' counsel should be prepared to address.

**C.      Plaintiffs' Bill Are Adequately Detailed And Reasonable**

The government complains that Plaintiffs counsel engaged in excessive block billing and that their time entries are vague, but neither claim holds merit.  The Supreme Court has emphasized:  "Plaintiff's counsel, of course, is not required to record in great detail how each minute of his time was expended."  <u>Hensley</u>, 461 U.S. at 437 n.12.  The Court should have no trouble reviewing Plaintiffs' counsels' time entries and being comfortable that those bills are reasonable.  Given that the work on this case was at any point in time focused largely on a then-pending motion, the work involved at any point of time is relatively clear in context.

The government's claims concerning block billing are over-blown.  A problem only arises when aggregating tasks in a single block of time obscures whether excessive time was spent on a particular task.  If the Court can look at the work performed and the time expended in the aggregate and concludes the time spent appears reasonable, that is sufficient.  Accordingly, numerous courts have declined to adopt any *per se* rule requiring discounts for block billing.  <u>See, e.g.</u>, <u>ICE Corp. v. Hamilton Sundstrand Corp.</u>, 432 Fed. Appx. 732, 742 (9th Cir. 2011) ("There is no per se rule in this circuit mandating a reduction or denial of a fee request based on block billing.").  If the Court can discern the reasonableness of the blocked entries, particularly in their context, that is sufficient under <u>Hensley</u>.  <u>Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co., Ltd.</u>, 668 F.3d 677, 690 (9th Cir. 2012).

Plaintiffs' counsel also are entitled to professional deference.  There is no certainty that any case will lead to a fee award under the EAJA and "'lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees' because '[t]he payoff is too uncertain.'  As a result, courts should generally defer to the 'winning lawyer's professional judgment as to how much time he was required to spend on the case.'"  <u>Costa</u>, 690

F.3d at 1136 (reversing fee cut under EAJA) (quoting <u>Moreno</u>, 534 F.3d at 1112).   That is particularly the case here.   Plaintiffs' counsel took this case *pro bono* because a judgment on the merits was important and served the public interest, but it was in counsel's business interest not to spend more time on the case than necessary as there was no assurance they would prevail or be paid.   In addition to the existence of a contingency on collecting at all, the EAJA cap meant counsel would be paid less than 1/3 of their standard rate.   Consequently, counsel had no incentive to run up a bill with the hope of collecting a contingent fee of less than 1/3 of what they could have obtained by instead billing a more typical firm client.   In addition, the billing process in this case was no different from the billing process Chadbourne follows generally.

Moreover, the government's proposed remedy of discounting the fees by 75% is Draconian.   (Dkt. 59 at 20.)   A fee reduction may be warranted only if it appears the time expended was excessive but, even then, "a fee award cannot be denied on this basis."   <u>Lyon v. Chase Bank USA, N.A.</u>, 656 F.3d 877, 892 (9th Cir. 2011).   A "district court must give reasons for reducing fees."   <u>Costa</u>, 690 F.3d at 1135.   "[A] district court can impose a reduction of up to 10 percent – a 'haircut' – based purely on the exercise of its discretion and without more specific explanation."   <u>Id.</u>   But it is reversible error to cut time by even 20-25% without a specific explanation beyond a general sense that the time seems excessive.   <u>Id.</u>   The larger the disparity between what is sought and what the Court awards, "a more specific articulation of the court's reasoning is expected."   <u>Moreno</u>, 534 F.3d at 1111 (Kozinski, J.) (reversing a fee reduction).

Plaintiffs have made this Court's job easier already by reducing their fees by 5% voluntarily.   While that leaves another 5% this Court could reduce under this formula if it believes any further reduction is warranted (and Plaintiffs do not believe a further reduction is

warranted), there is no basis for the steeper cuts requested by the government and that would require a more concrete explanation from the Court.

In the context of litigation, these fees are very reasonable if not incredibly low (particularly given the statutory fee cap on the hourly rate).  Rather than drive up fees, Plaintiffs counsel worked with the government to keep fees low.  Plaintiffs have agreed to numerous extensions so the parties could work through issues rather than litigate them, ranging from filing an answer to negotiating an agreed-upon judgment, and Plaintiffs even consented to an extension for the government to respond to the fee request in hope that litigation here could be avoided too. At every turn, Plaintiffs counsel have exercised their professional judgment to minimize what has been billed to this case, rather than run up the bills unnecessarily.  They should be compensated for that work.[6]

## CONCLUSION

Plaintiffs' request for attorneys' fees and costs should be granted.

---

[6]     Additional fees were generated in preparing this reply.  A Chadbourne lawyer, Mr. Man, spent an additional 10.7 hours reviewing the government's opposition, researching the case law and drafting this response.  At the rate of $192.24 per hour, that amounts to $2,056.97.  Minus the 5% voluntary reduction (and voluntarily excluding limited fees for an associate and paralegal), that is $1,954.12 in addition to the previous amount sought of $137,087.49 for a total of $139,041.61.   An Outserve-SLDN attorney, Mr. Goodman, spent an additional 1.1 hours reviewing the government's opposition and editing this reply.  At the rate of $192.24 per hour, that amounts to $211.46.  Minus the 5% voluntary reduction, that is $200.89 in addition to the previous amount sought of $33,492.20 for a total of $33,693.09.

Respectfully submitted,
/s/ Ian McClatchey

Ian McClatchey, BBO No. 676664
IMcClatchey@Chadbourne.com
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 408-5303 (phone)
(646) 710-5303 (fax)

/s/ John M. Goodman

John M. Goodman
JGoodman@SLDN.org
David McKean
DMcKean@SLDN.org
SERVICEMEMBERS LEGAL DEFENSE NETWORK
Post Office Box 65301
Washington, DC 20035
(202) 621-5401 (phone)
(202) 797-1635 (fax)

/s/ Abbe David Lowell
Abbe David Lowell
ADLowell@Chadbourne.com
Christopher D. Man
CMan@Chadbourne.com
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, DC 20036
(202) 974-5600 (phone)
(202) 974-5602 (fax)
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that, on December 16, 2013, the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send electronic notice of such filing to all participants in the case.

   /s/ Christopher D. Man
Christopher D. Man